THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
GAIL MAREK *et al.*, Defendants-Appellants.

First District (4th Division)    Nos. 79-358, 79-367 cons.

Opinion filed December 31, 1980.

Sam Adam and Charles Locker, both of Chicago, for appellants.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Myra J. Brown, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

On August 16, 1975, four persons died as a result of a fire which occurred at 2802 South Austin Avenue in Cicero. Lillian Weisner, the owner of the building, and Gail Marek, Weisner's daughter, were charged in the circuit court of Cook County by a 13-count indictment with arson and with the murders of Jannett Jundt and Jundt's three children, Joseph, Charles, and Elisa Maldonado. Directed verdicts were granted in favor of the defendants on the counts which charged knowing and intentional murder. The remaining nine counts went to the jury. The defendants were found guilty of murder and arson. They were sentenced to 25 years on each murder charge and 5 years on the arson charges, the sentences to run concurrently. Marek and Weisner appealed. Their appeals were consolidated and they filed joint briefs. Weisner's appeal was dismissed on March 13, 1980, following her death. On appeal, Marek (the defendant) argues (1) the trial court committed reversible error in denying her motions to suppress oral and written statements; (2) the trial court should have declared a mistrial or should have stricken testimony recounting her oral statements because the substance of these statements was not disclosed pursuant to discovery; (3) the trial court should have granted her motion for acquittal because the State failed to prove the *corpus delicti* beyond a reasonable doubt; (4) the trial court should have granted her motion for a mistrial because the State's Attorney told the jury that she had been on probation; (5) the trial court improperly redacted her

confession; and (6) the trial court abused its discretion in admitting evidence after the close of all the evidence where the defendants were not allowed to introduce evidence in rebuttal.

We first relate the facts concerning the issue of whether the trial court erred in denying the defendant's motions to suppress. She was interviewed in the early morning hours of August 17, 1975. She returned to the station at 7 o'clock that evening. She gave two written statements either that evening or early the following morning.

According to the initial paragraphs of the first written statement, it was taken at approximately 11:45 p.m. on August 17, 1975, in the detective's room of the Cicero Police Department. Assistant State's Attorney Lawrence O'Gara, Assistant State's Attorney Ronald P. Stronjy, Cicero Police Department Detective Jack Oden, and Cicero Fire Department Inspector Harold R. Adams were present. The questioning was conducted by O'Gara. Edward Stabrawa was the court reporter.

O'Gara read the defendant each of the *Miranda* warnings. After each warning he asked her whether she understood, and in each instance she answered that she did. O'Gara then asked the defendant whether she wanted to talk to him without having a lawyer present. She answered that she did. He asked her whether she understood that she could stop talking to him at any time and that she could demand a lawyer at any time. She answered yes. O'Gara asked the defendant whether she wished to make a statement and the defendant began her statement.

The defendant stated that she went to Weisner's home at 2802 South Austin, at approximately 5 p.m. on August 16, 1975. She brought her youngest child in the house for a nap. She, her two older children, and Weisner went outside. After a while Jannett Jundt and her three children, who lived in the upstairs apartment, arrived home from the laundromat. The defendant had known Jundt for approximately two years.

At approximately 11:30 that evening the defendant, her husband, her children and Weisner were in the first floor apartment of Weisner's house. Jundt, her three children and her husband, Ernest, were in the upstairs apartment.

Weisner and the defendant had a conversation concerning a fire. According to the defendant, Weisner wanted to set fire to the house at 2802 South Austin in order to collect on the insurance. Weisner said that she had hired a person for $25,000 to set fire to the house but that she was unable to obtain the money. Weisner told Marek that she had asked "Mike the Mouse" if he would set the fire. He agreed to do so if Weisner would pay him $400 before the fire was set and $400 afterwards. Weisner offered the defendant's husband $500 to set the fire. He refused. Weisner then said, "We got to do it." The defendant asked, "What about them upstairs?" Weisner answered, "We'll just have to yell."

Weisner went into the back bedroom with the defendant, the defendant's husband, and the defendant's youngest child. The defendant went to the bedroom closet where clothes were being stored. She had a matchbook from Walgreens in her hand. She lit a match and dropped it on a bedspread which was in the closet. Then Weisner lit a book of matches and put it in the closet. The defendant's husband yelled, "Don't, don't." The fire started blazing. All the clothes in the closet caught fire. The defendant grabbed her children. She was standing in the hallway yelling for Jannett Jundt. Weisner called for Jannett and Ernie Jundt shouting, "The house is on fire." The defendant heard Ernie Jundt say "Yeah." The defendant, her husband, her children, and Weisner ran out the front door. The defendant related that she did not think that the whole house would catch fire. She just wanted one room to be burned.

The defendant signed and initialed each of the 15 pages of the first written statement. O'Gara and Oden signed as witnesses.

The initial paragraphs of the second statement stated that it was given at 4 a.m. on Monday, August 18, 1975, at the Cicero Police Department. Present were O'Gara, Oden, and the defendant. Stabrawa was the court reporter. O'Gara readvised the defendant of her constitutional rights. She was asked whether she understood each of them and answered that she did.

The defendant was asked whether, after signing and initialing the first statement, she had told O'Gara that something contained in the first statement was not true and correct. The defendant answered that, contrary to what she had told O'Gara during the first statement, her husband was not present at Weisner's house at the time of the fire. She stated that everything else in the first statement was true. The second statement was signed and dated by the defendant. O'Gara and Oden witnessed the signature.

At the hearing on the motion to suppress, August F. Mazzona testified that at the time of the fire he was chief arson investigator for the State of Illinois Department of Law Enforcement, Division of Fire Prevention. On August 17, 1975, at approximately 4 a.m. Mazzona interviewed the defendant and her mother at the Cicero police station. Cicero Police Inspector Adams and Cicero Police Officer Biziarek were present during this interview.

Mazzona conducted a second interview with the women at approximately 7 or 7:30 that evening. This interview took place in the detective room of the Cicero Police Department. Present were Mazzona, the defendant, and Cicero Police Officer Wilson. Mazzona read the *Miranda* warnings to the defendant from a form. After each item he asked her whether she understood. He handed the form to the defendant. She looked at it for a few minutes and then signed it. Mazzona and Wilson

signed as witnesses to the defendant's signature. Mazzona questioned the defendant for an hour and a half to two hours. He then left the room for approximately 5 to 10 minutes. At that time Oden and Wilson and one other detective were present. Fire Inspector Adams may also have been present.

The defendant appeared highly nervous, but answered questions. At one point she said she was sick and indicated that she might vomit. She did not vomit but did spit into a wastepaper basket.

On cross-examination, Mazzona testified that the detective room in which the interview was conducted was approximately 14 feet by approximately 12 or 13 feet. He stated that there were no *Miranda* warnings given during the morning interview because the defendant was not a suspect at this time.

The morning interview lasted from 4 until 4:30 or 5. The evening interview began at approximately 7:30 or 8, and continued for an hour and a half or two hours. Mazzona, Wilson and the defendant were the only persons in the room. During that period no one else entered the room, with the possible exception of someone who may have brought coffee or water to the door for the defendant. During this time the defendant sobbed occasionally. Although she complained on one occasion that she was nauseous, she did not ask to go to the washroom. At no time during this two-hour period did the defendant complain that she was tired. Rather, she told Mazzona that during the time between the morning and evening interviews she had slept at her home. Mazzona did not remember the defendant asking to see either her mother or her husband.

When Mazzona left the room after an hour and a half to two hours, Oden entered the room. Adams may have entered the room with Oden. Mazzona was gone for about 10 minutes and then was called back into the room. He stayed in the room for approximately 10 minutes. He then left the room again for 5 or 10 minutes. It was then approximately 10:30 or 11 p.m. The Assistant State's Attorney arrived shortly thereafter. The Assistant State's Attorney waited for a court reporter.

In response to a question asked by defense counsel, Mazzona admitted that he had included the following statement in a report he prepared on August 19, 1975:

> "Approximately 1:00 A.M., Sunday, August 17, State's Attorney's Office was called and two Assistant State's Attorney's arrived at the Cicero Police Station where they obtained a statement from Gail Marek, Lillian Weisner, Carl Marek and Jerry Weisner."

Someone at the police station told Mazzona that Weisner had asked for insulin, which was given to her. In response to a telephone call made by the police department, someone, whom the witness believed to be Weisner's husband, came to the station "with her needs."

Cicero Police Department Detective Jackie Oden testified that at approximately 9:30 p.m. on August 17, 1975, he interviewed the defendant. Cicero Fire Department Inspector Adams was also present. Prior to the interview Oden read the *Miranda* rights to the defendant. After reading each right he asked her whether she understood. Each time she answered that she did. The defendant then made a statement concerning the fire. Oden notified State Investigator Mazzona of the statement and asked him to come into the room. Mazzona asked her some questions and left the room again. Oden continued to interview the defendant. Oden then called his partner, Detective Wilson and Mazzona into the room. The defendant then gave further statements. Oden then called the Assistant State's Attorney's office. Assistant State's Attorneys Ronald Stronjy and Lawrence O'Gara arrived at the Cicero Police Station at approximately 11 p.m. The court reporter arrived sometime before 12 a.m. While they were waiting for the court reporter, O'Gara introduced himself, read the defendant her *Miranda* rights, and asked her to repeat the statement that she had given previously. She did so. Present were O'Gara, Stronjy, Adams, Oden and possibly Wilson. O'Gara then took a statement from the defendant in the presence of a court reporter. The same men were present during this interview. During the interview Cicero Police Officers Biziarek and DeFalco entered the room.

"Quite a few hours later, maybe two," the statement had been typed up by the court reporter, the defendant had read and signed each page, and O'Gara asked the defendant, as she was reading the pages, if everything in the statement was true and correct. The defendant answered no, that there was something she would like to change. She made an additional statement.

During the second written statement, O'Gara, Oden, the defendant, and the court reporter were present. Oden could not remember if anyone else was present. The defendant appeared nervous and apprehensive. Her answers were responsive to the questions. Neither he nor anyone in his presence mentally or physically coerced either the defendant or Weisner.

On cross-examination Oden testified that it had taken the defendant approximately one-half hour to read the first written statement once it had been transcribed. At no time did he hear her ask for any coffee. Oden stated that the defendant asked to talk to her mother and to her husband, which was allowed. The defendant did not ask for a lawyer. She did not say that she was nauseous or ill. Oden did not see anyone give her a wastepaper basket to spit into. She did not ask for a drink of water at any time. She did not ask to go to the bathroom until after she made the statements. According to Oden the defendant was sobbing at different times during the interview. The defendant did not make any reference about her children to Oden.

Cicero Police Detective James DeFalco testified that at approximately midnight on April 17, 1975, he entered the detective room of the Cicero police station in order to obtain some of his equipment. The defendant was being questioned. He did not recall anything that was said to the defendant, since he was not paying attention and believed that they had stopped talking when he walked in.

On cross-examination, he testified that the only persons he can specifically remember being in the detective room were Oden, Mazzona, and the defendant. DeFalco's shift began at approximately 11 o'clock that night, but he did not walk into the detective room immediately as he did not want to interrupt the interview.

Investigator Adams testified that he had been employed for more than 17 years by the Cicero Fire Department, Illinois Fire Prevention Bureau. He interviewed Weisner and the defendant at the Cicero police station at approximately 4 a.m. on April 16, 1975. Also present during the interview were Mazzona and Cicero Police Officer Biziarek. He did not consider either Weisner or the defendant to be suspects at that time. Weisner and the defendant each gave a statement with respect to the origin of the fire. They stated that they were tired and they asked if they could leave. They were allowed to go home, but were told that they might possibly be called for further questioning.

Later that day Adams telephoned both women and asked them if they would return to clarify a few points in their statements. The defendants returned to the station at approximately 7 p.m. Adams interviewed the defendant's husband for approximately one hour. He then talked with the defendant. Also present during this interview were Oden and Adams. The interview lasted about 10 minutes. The defendant gave information about the fire. Adams then called Detective Wilson and Investigator Mazzona, who were in the interview room for approximately 10 or 15 minutes. Some time thereafter there was a call made to the State's Attorney's office. At approximately 11 p.m. two Assistant State's Attorneys arrived at the station, one of whom was O'Gara. Adams, Oden, and Wilson were present as the Assistant State's Attorney took a statement from the defendant in the presence of a court reporter.

Later the defendant gave another statement. Adams could not remember what time that statement was taken. Throughout the questioning, the defendant appeared nervous, Weisner appeared calm and somewhat on the aggressive side.

On cross-examination Adams stated that during the morning interview the defendant did not cry. After further questioning, he stated that she did. While she was sobbing, she stated, "You won't take my son away from me, will you?" Adams had not asked her any questions about her son prior to this statement.

Adams stated that during the evening interview he did not remember

discussing the defendant's son with her. He did not remember hearing anyone telling the defendant that if she did not confess that the police would take her children away from her and that she would never see her family again. During the evening interview, the defendant may have been crying.

On further cross-examination Adams stated, in reference to the evening interview, that he first talked to the defendant at about 10 p.m., approximately three hours after she arrived at the station. During that interview Mazzona and Wilson were present. The witness did not remember whether the defendant had asked or been allowed to use the bathroom. He did not remember the defendant telling him that she was nervous and wanted to vomit. When asked whether the defendant's hair was well kept or disheveled at the time of the evening interview, the witness answered that it was about the same way as it was on the day of his testimony. He described her hair on the day of his testimony as not being "combed and brushed like she were going out somewhere special." Rather, it was "in between." On direct examination and during cross-examination, Adams testified that he did not have his watch with him on August 16, 1975. He was therefore unsure of the time periods involved.

Assistant State's Attorney Lawrence O'Gara testified that he arrived at the Cicero police station at approximately 10:30 or 11 p.m. on August 17, 1975. At approximately 10:45 he talked to the defendant. Present were Assistant State's Attorney Ronald Stronjy, Oden, and several law-enforcement officers. To the best of his recollection, Mazzona and Adams were also present. Prior to commencing the interview O'Gara advised the defendant of her rights. He recited each of the *Miranda* rights to her and she stated that she understood each right. O'Gara questioned the defendant as to her treatment by the law-enforcement personnel who were present at the Cicero Police Department prior to his arrival. She did not complain of any maltreatment. The defendant then gave a statement. He talked with the defendant again at 10:55 p.m. Law-enforcement personnel were present.

He talked to the defendant again at approximately 11:45 p.m., this time in the presence of court reporter Edward Stabrawa. Also present were Stronjy, Oden and Adams. During the course of the interview two Cicero police officers entered the room. The defendant was advised of her rights prior to making any statements. This interview lasted 20 to 30 minutes.

The statement was typed by the court reporter. O'Gara gave it to the defendant and asked her to read it to assure herself that it accurately reflected what she had told O'Gara during the interview. She did. O'Gara asked her whether it was a true transcript of the conversation. He asked her to initial it and sign it.

At approximately 4 a.m. the defendant gave another statement in

the presence of the court reporter. Oden was present. Prior to giving that statement the defendant was advised of her *Miranda* rights by O'Gara.

Each time O'Gara gave the defendant her rights he read them to her one at a time. After each right was read the defendant stated that she understood it.

On cross-examination O'Gara stated he could not remember exactly how long it took the defendant to read the transcription of her first written statement. He was certain that it did not take more than one hour. He was present while she read the statement. O'Gara read the typed statement to the defendant before he gave it to her for her own reading. The defendant signed the first statement at approximately 3 a.m.

O'Gara believed that the defendant spoke to Weisner prior to signing the statement. After signing the first written statement, the defendant asked to see O'Gara. She told O'Gara she wanted to change something in the first statement. At this time she was seated in the general reception area of the Cicero police station. She let O'Gara know that she wanted to change her statement by simply calling to him.

O'Gara did not remember seeing the defendant cry. He did not remember the defendant asking to go to the bathroom. She did not tell him that she was nauseous, that she was sick or that she wanted to vomit. O'Gara did remember her describing a feeling that she would like to throw up, that her insides were retching. O'Gara did not see her spit into a basket. The defendant did not ask to see either her mother, a lawyer, or her husband. O'Gara did see her with her husband "at sometimes." She did not ask to use a telephone.

On redirect examination, O'Gara stated that at no time during the course of the interview did the defendant appear to have trouble understanding him. He did not have trouble understanding the defendant except for a few times when she was crying. He remembered seeing some bruises on the defendant's legs.

Assistant State's Attorney Ronald Stronjy testified that he was present during the interviews of the defendant and Weisner at the Cicero Police Department on August 17, 1975. Neither he nor anyone in his presence in any way abused either the defendant or Weisner. Neither the defendant nor Weisner complained to him or to anyone in his presence of the treatment afforded to them. Neither the defendant nor Weisner appeared hysterical, disoriented or out of touch with reality.

On cross-examination Stronjy testified that he arrived at the Cicero Police Department at approximately 10 p.m. He saw the defendant a few minutes after arriving at the station. She was in the juvenile cell lockup, apparently asleep. The juvenile cell lockup is a small room. It did not have a cell door, but rather had a regular door with a small window in it. There was a bunk bed in the room.

O'Gara arrived at the police station approximately 30 minutes after Stronjy did. Stronjy did not talk to the defendant before O'Gara arrived.

Within five or ten minutes after O'Gara arrived, O'Gara began to talk with the defendant in the detective room of the Cicero police station. O'Gara, Stronjy and the defendant were present. O'Gara asked the defendant whether she had been mistreated. She answered that she had not been. She was not crying. Stronjy noticed some marks on her legs, but there was nothing unusual about them. There "most definitely" was not an odor of vomit in the room.

After a very short time, Oden, Adams and possibly Mazzona entered the room. O'Gara explained "certain things" to the defendant for approximately 5 to 10 minutes. She then started talking with O'Gara. She talked for approximately 20 or 30 minutes. The witness saw the defendant crying. After the interview everyone left the detective room and the defendant was taken back to the juvenile lockup. Stronjy waited for the court reporter to arrive.

The court reporter arrived at approximately 11:45 p.m. Another interview was conducted in the detective's room, this time in the presence of the court reporter. Also present were O'Gara, Stronjy, Oden and Adams. O'Gara asked the questions. The only person who questioned the defendant was O'Gara. This interview lasted approximately 15 to 20 minutes. Stronjy could not recall whether the defendant cried. At the conclusion of the interview everyone left the room. Stronjy believed that the defendant was taken back to the juvenile cell lockup.

The court reporter began typing the statement. Stronjy went into the detective's room with O'Gara, Oden, Adams, Biziarek, DeFalco, Wilson and Weisner. There was a conversation with Weisner. After about 10 or 15 minutes the defendant entered the room. The conversation with Weisner continued. The defendant was not crying as she walked into the room. She appeared normal. She did cry during the course of the conversation.

Stronjy saw the defendant sign the first written statement and saw her sign the second written statement. The first one was signed "possibly shortly before 4 o'clock a.m." Stronjy was not present for the second recorded interview. He left the station with O'Gara at 5:15 or 5:30 a.m.

Cicero Police Officer Robert Biziarek testified that he was present at the morning and evening interviews. Neither he nor anyone in his presence abused the defendant or Weisner in any manner. Neither woman complained to him or anyone in his presence about the treatment afforded them. Neither appeared hysterical or out of touch with reality at any time. Neither he nor anyone in his presence shook or manhandled either woman.

On cross-examination Biziarek testified that he saw the defendant in the detective room at 5 or 10 minutes before midnight on August 17.

O'Gara, Stronjy, Oden and a male court reporter were present. Biziarek remained in the room no more than 30 minutes. O'Gara was asking questions and the defendant was answering. She was not crying. Biziarek could not remember whether Mazzona was also in the room. After about a half hour the court reporter left to type up the statement. The defendant was taken out of the room and Weisner was brought in. Biziarek saw the defendant speak to Weisner either in the detective room or just outside the door. The door was open.

Cicero Police Officer Robert Wilson testified that he was at the Cicero police station on the evening of August 17, 1975. Neither he nor anyone in his presence abused the defendant or Weisner in any way. Neither woman complained to him or to anyone in his presence about the treatment afforded to them. Neither defendant appeared hysterical or out of touch with reality.

On cross-examination Wilson testified that he arrived at the station at approximately 2:30 p.m. on August 17. The defendant and Weisner arrived at 6 or 7 p.m. He was present at an interview with the defendant. The only other person present was Mazzona. The interview lasted 45 minutes to an hour. At the conclusion of the interview the defendant was left alone in the detective's office. Wilson did not talk to the defendant again that evening nor did anyone else talk to her in his presence.

During the interview, the defendant stated that she was sick and wanted to throw up. She asked permission to go to the washroom. She did not throw up, but spit into a wastebasket. She was crying during the interview.

Edward Stabrawa testified that he is a licensed and certified shorthand reporter. He has been employed by the State's Attorney's Office of Cook County for approximately 20 years. On August 17, 1975, he was called to the Cicero Police Department. He transcribed statements made by the defendant.

Stabrawa was shown a Polaroid photograph of the defendant. He said he took the picture at the conclusion of the first recorded interview. At the time he asked the defendant to write her name and address and the date on the back of the photograph. She did so. O'Gara also signed. Stabrawa then wrote on the back of the photograph "picture taken on Monday, August 18, 1975 at 12:10 a.m. by" and signed his name.

On cross-examination Stabrawa testified that he arrived at the station at about 11:40 p.m. About five minutes later he entered a small office. The interview began. The defendant, O'Gara, Stronjy, Oden and Adams were present. Anything that O'Gara asked in Stabrawa's presence was reflected in the typed statement. Stabrawa did not recall seeing the defendant crying. The interview took approximately 30 minutes. After taking the defendant's picture Stabrawa left the room and proceeded to type the

shorthand conversation from his notes. He typed each page in approximately five or six minutes.

Stabrawa gave the statement to the Assistant State's Attorney at approximately 3:20 or 3:30 a.m. He did not see the defendant sign the statement.

At approximately 4 o'clock in the morning O'Gara asked Stabrawa to record a second statement. The statement took approximately five minutes.

Mazzona, Oden, DeFalco, Adams, O'Gara, Stronjy, Biziarek, Wilson and Stabrawa each testified that neither he nor anyone in his presence threatened, struck or beat the defendant or made any promises to the defendant. Each stated that neither he nor anyone in his presence twisted the defendant's arm or pulled her hair.

Marek testified that she was interviewed at the Cicero police station for approximately one hour sometime after 4:30 a.m. on August 17, 1975. At approximately 7 o'clock that evening the defendant and Weisner returned to the Cicero police station because a Cicero police officer had called and told Weisner that they needed, "to clean up a few things."

The defendant, her husband and Weisner waited for a while at the police station. Then Oden brought the defendant into a little office. There were four police officers in the room. The defendant could not remember their names. She remained in the little room for "a lot of hours." Oden asked all the questions.

The defendant asked Oden for a glass of water and to go to the bathroom. He refused. Later she told Oden that she had to throw up. Oden told her that if she had to throw up that she should do so in the wastebasket. The defendant threw up in the wastebasket. Oden pulled her hair, twisted her arm and shook her. When he shook her, her legs struck "objects." The defendant asked to see her mother and her husband "a lot of times." She was never allowed to do so. Oden told the defendant that if she didn't tell him the truth he was going to take her children away from her.

Oden told the defendant that he had seen her husband running from the scene of the fire. She answered that her husband was not at Weisner's house at anytime on the date of the fire. Oden told the defendant that Weisner had given a statement to the effect that the defendant and her husband had set the fire. The defendant felt tired, nauseated, and hungry.

Eventually she gave a statement. She did not know the name of the man to whom she gave the statement. Four men including Oden and a court reporter were present. The statement was not true.

After the defendant gave the first statement, Oden came back into the room and told her that she was lying about her husband being there. Two other officers were present at that time. The defendant reminded

Oden that she had told him that her husband was not there and that he would not believe her.

The defendant testified that Oden gave her the first statement and told her to sign it. She could not read it but she signed it. She did not read the second statement but signed it because she was told to do so.

Defense counsel showed the defendant a paper on which the *Miranda* warnings were printed. It was dated August 17, 1980, and signed by the defendant. Counsel asked the defendant to read it out loud. She read portions but there were many words which she stated she did not know. She remembered signing the document. Defense counsel showed the defendant the two written statements. She identified her initials and signatures on the documents. Counsel asked the defendant to read parts of the statement out loud. As the defendant read, she stated she did not know many of the words.

In response to questions by her counsel, the defendant stated that she had heard the terms "State's Attorney" and "prosecutor" but did not know what they meant.

On cross-examination the defendant testified that the morning interview was conducted by a "fire marshall." She was at the station approximately 30 minutes. No one threatened, beat, struck or scared her in any way. When she left the station she went home.

She knew that the person who conducted the evening interviews was Oden because she had "seen him around a lot." He was married to one of her girl friends.

The defendant stated that she was never advised of any of the *Miranda* rights. She did not know what it meant to "have the right to remain silent" or what it meant when someone told her she could stop talking at anytime she wanted to.

The defendant knew how to write her name but could write nothing else. She did not know her address.

Oden pulled her hair, shook her once, and twisted her arm once. He called her dirty names and told her that if she did not tell him the truth he was going to take her children away from her. While Oden was shaking her she hit her legs against the desk. Both of her knees and the side of her right leg hit the desk. Her leg hit the desk a couple of times. Thereafter the fire marshal entered the room. He did not hit her, twist her arm, pull her hair, or threaten to take her children away.

The Assistant State's Attorneys did not come inside the room. They were at the back door. The Assistant State's Attorneys did not ask the defendant whether anyone had hurt her. She did not tell either of them what Oden had done to her because she was scared.

Oden had asked the defendant all of the questions when the defendant gave the first and second written statements. The defendant

was certain that Oden had asked the questions and not the Assistant State's Attorney.

After giving the first written statement, Oden walked with the defendant to the back of the room and told the Assistant State's Attorneys that she had to give a different statement, that her first statement was a lie. She reminded Oden that she had told him the truth prior to giving the first written statement. The Assistant State's Attorney was there and heard her say this. The defendant did not read either statement before signing it. Neither statement was read to her before she signed it.

The defendant stated that the picture taken of her at the police station on August 18, 1975, did not reflect the way she looked after she gave the statements. Rather, it showed how she looked when she first arrived at the police station.

At one point during cross-examination the court indicated that the defendant was crying. He asked her whether she would like to rest for a while. She answered, "No, I'll finish." Defense counsel asked for a recess. The court adjourned for a five-minute recess so that the witness could compose herself.

On redirect examination, the defendant stated that she could write her name and address but nothing else.

Lillian Weisner testified at the suppression hearing. This testimony will be related only as it affects the issue of whether the defendant's motion to suppress was improperly denied. Weisner stated that while she was at the station on the night of August 17, 1975, she saw the defendant being taken out of a room by police officers. The defendant's hair was "all over her head." She was crying and hysterical.

Weisner was then taken into the room from which the defendant was removed. Oden, Adams, Mazzona and two other officers were present. About an hour later the Assistant State's Attorney came in. She told Oden she was not guilty and asked to call her attorney. Weisner stated that Oden "kept after her," and refused her requests to use the washroom, for water, for insulin and for food. O'Gara then came in. He also ignored her request to go to the bathroom. About an hour and 15 minutes after Weisner was brought into the room, the defendant came in. She looked worse than before. She was sobbing and said to Weisner, "Mother, you did the arson, or we did." Weisner testified that at this point she, Weisner, was almost unconscious and would have admitted to anything. However, she never made a statement.

Weisner's physician stated that Weisner suffered from moderate diabetes. He knew that after the fire she had been treated for smoke inhalation and was prescribed valium. According to the physician, if Weisner had lapsed into a diabetic coma, she would not have regained consciousness without treatment.

Donald Lambert, director of student services for Cicero elementary public schools, also testified. According to Lambert, the defendant's 1959 scholastic report showed her chronological age as 7 and mental ability in the lower limits of average, upper limits of dull normal. She had an IQ of 90. The last entry on the report of June 1965 showed a reading level of not beyond second grade. Tests administered when she was 12 indicated a lower result than the 1959 test. Lambert believed that the defendant's 1975 ability would be close to the 1959 score.

Lambert stated that the defendant was diagnosed as "functionally retarded." A person who is functionally retarded functions at below the level at which persons with an IQ of 80 would function. The functionally retarded have a variety of symptoms that are characteristic of mental retardation. However, persons who are functionally retarded have the ability to progress but do not do so because of emotional or behavioral reasons. According to Lambert, the defendant was placed in a home tutorial program during the 1966-67 and 1967-68 school years. The home tutorial service was used only for students who had serious behavioral or social acting-out problems. Prior to beginning the tutorial program, the defendant had been placed in a special class for children with behavioral problems.

Susan Dickensheets, an instructor at the Pace Institute at Cook County jail, testified that the defendant came to the institute while incarcerated. Dickensheets administered the Stamford achievement test, which measures reading, language and math skills. Dickensheets was not able to administer the first two portions of the test because the defendant was unable to read even the first sentence of those portions of the test. Dickensheets did not attempt to administer the science and spelling portions of the exam. Dickensheets had no way of knowing whether a person is refusing to read or is unable to read. Marek scored second-grade, third-month level in the word study skill section of the test. She scored third-grade level on the arithmetic portion. During the time that Dickensheets tutored Marek her reading improved. According to Dickensheets, Marek's reading problem might be visual.

The defendant's first contention is that the trial court committed reversible error in denying her motions to suppress. She does not deny that she was advised of her *Miranda* rights prior to making any statement. Rather, she argues that her waiver of the rights to remain silent and to be represented by counsel was not voluntary because she was threatened, beaten, denied food, denied sleep and refused the use of washroom facilities. She also contends that her waiver was not knowing or intelligent, because she has a low IQ, is functionally retarded, and is unable to read.

We first address the defendant's contention that she was subjected to

physical and mental coercion. She testified that Oden pulled her hair, twisted her arm and shook her once so hard that her legs struck the desk. When her legs struck the desk she received bruises on her calf and knees. Oden called her dirty names. She told Oden that she had to throw up and asked to go the washroom. She was made to throw up into the wastebasket and was refused permission to go to the washroom. Oden told her that if she did not tell him the truth he was going to take her children away from her. The defendant alleges that she was refused permission to see her mother and her husband. She was not allowed to make a telephone call.

Four Cicero police officers, the chief arson inspector for the State of Illinois, a Cicero fire inspector, two Assistant State's Attorneys and a court reporter denied that they or anyone in their presence used force or made threats of force. The witnesses denied that the defendant was not permitted to go to the washroom. They denied that she threw up in a wastebasket. According to the State's witnesses, the defendant was allowed to see both her husband and her mother. No one threatened the defendant that her children would be taken away from her.

■■ It is for the trial court to resolve conflicts in the evidence. In that the trial judge has observed the demeanor of the witnesses, has heard their testimony, and has evaluated other evidence, he is best equipped to determine the voluntariness of a confession. (*People v. Medina* (1978), 71 Ill. 2d 254, 375 N.E.2d 78.) In making the determination of voluntariness, the court is not required to be convinced beyond a reasonable doubt; rather, the trial court's findings will not be disturbed unless it can be said that they are contrary to the manifest weight of the evidence. (*Medina; People v. Higgins* (1972), 50 Ill. 2d 221, 278 N.E.2d 68.) We believe that the evidence presented below supports the conclusion that the defendant's waiver was voluntary rather than a result of physical and mental coercion.

We next consider the defendant's contention that she did not knowingly and intelligently waive her *Miranda* rights because she has a low IQ and is unable to read.

The determination of whether there has been intelligent waiver of rights depends upon the particular facts and circumstances of each case (*Johnson v. Zerbst* (1938), 304 U.S. 458, 82 L. Ed. 1461, 58 S. Ct. 1019; *People v. Turner* (1973), 56 Ill. 2d 201, 306 N.E.2d 27) and is a question for the trial court (*People v. Simmons* (1975), 60 Ill. 2d 173, 326 N.E.2d 383). The finding of the trial court is not to be disturbed unless against the manifest weight of the evidence. *People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870.

■■ Here, defense witnesses testified that in 1959 the defendant's IQ was 90. Tests administered five years later indicated a lower result. A defense witness testified that the defendant's 1975 ability would be close to the 1959 score. The 1959 score was described as being in the low-average range.

The defendant had been diagnosed at one time as being "functionally retarded." That is, she had a variety of symptoms that are characteristic of mental retardation, but her failure to progress was a result of emotional or behavioral reasons. We believe that on the basis of the defense witness' testimony that the defendant was in the "low average range" of intelligence combined with the trial court's own observation of the defendant and her testimony support the trial court's determination that the defendant was capable of an intelligent waiver of her *Miranda* rights.

We do not believe that the defendant's alleged inability to read is relevant here. According to numerous witnesses, the *Miranda* rights were read to the defendant. Such a reading was made not once but many times. The two statements transcribed by the court reporter also reflect that the *Miranda* rights were read to the defendant and that she indicated she understood them. There is also evidence that the defendant's written statement was read to her before she signed it.

The defendant's next contention concerning her confession is that the substance of her statement shows it to be involuntary. In her first oral statement she indicated that her husband was at the Weisner home at the time of the fire. She said that her mother had offered him $500 to set the fire and he refused. She also said that when she struck the match her husband yelled "Don't, don't." She claims that the fact that it was later established that her husband was not present at the house at the time of the fire proves that she said only what she was told to say when making the first recorded statements.

■■ We do not believe that this alleged inaccuracy in the defendant's first written statement mandates the conclusion that the entire statement was involuntary. Such minor inconsistencies between the confession and other evidence go to the weight to be given the confession and not to its admissibility. (*People v. Norcutt* (1970), 44 Ill. 2d 256, 255 N.E.2d 442.) We do not believe the fact that the defendant initially stated that her husband was at the Weisner home supports her contention that her confession was the result of coercion by the police.

Accordingly, we conclude the trial court acted properly in denying the defendant's motions to suppress.

■■ The defendant also contends that the trial court should have declared a mistrial or should have stricken testimony recounting oral statements made by the defendant because the substance of these statements was not disclosed to the defendant pursuant to discovery. However, the record reveals that, in response to a request for disclosure of "the substance of oral statements made by the defendant," the People disclosed a list of all utterances and copies of all reports written by witnesses. Where the defendant does not claim that he is not notified of the existence of the witnesses to the oral statement there is no prejudice from any

nondisclosure of the substance of the statements. (*People v. McAleer* (1975), 34 Ill. App. 3d 821, 341 N.E.2d 72.) The discovery rules do not require that the prosecution reduce the substance of an oral statement to memoranda form prior to presenting a witness to the statement. (*People v. Abbott* (1977), 55 Ill. App. 3d 21, 370 N.E.2d 286.) Further, in the instant case, Marek did not request that her oral statements be reduced to a writing, and the substance of her statements was testified to by O'Gara during *voir dire*. We therefore conclude that the court acted properly concerning the testimony of the defendant's oral statements.

■■ The defendant also contends that the trial court improperly redacted Marek's confession. However, the defendant's statement was redacted to protect codefendant Weisner's interest. Only Weisner objected to the redaction on the grounds now argued on appeal. The defendant objected on another basis and was given the opportunity to change the statement. She did not do so. Because the issue raised on appeal relates only to defendant Weisner and Weisner's appeal has been dismissed, we do not consider the redaction issue.

■■ The defendant next contends that a new trial should be ordered because the State told the jury that the defendant Marek had been on probation. However, the first evidence as to the fact of the defendant's probation was introduced by a defense witness. Further, the prosecutorial reference was objected to, the objection was sustained, and the jury was instructed to disregard. Therefore, even if the reference were error, that error was cured. *People v. Outlaw* (1979), 75 Ill. App. 3d 626, 394 N.E.2d 541; *People v. Terry* (1976), 38 Ill. App. 3d 517, 347 N.E.2d 869.

The defendant next contends that the *corpus delicti* was not properly established. She argues that the only evidence that tended to prove the fire was caused by a criminal agency was her confession and that since there is no evidence or corroborating circumstances to establish that element a reversal is required. However, the record reflects sufficient evidence to corroborate Marek's confession and sufficient evidence independent of the confession to establish criminal agency.

The test of whether the *corpus delicti* has been established is whether the evidence as a whole proves the fact that a crime was committed and that the accused committed it. (*People v. Donalson* (1977), 50 Ill. App. 3d 678, 365 N.E.2d 658.) Here, Mazzona, who was at that time chief arson investigator for the State of Illinois Department of Law Enforcement, testified that he examined the premises where the fire had occurred and found only one point where the burning was at its lowest and went upward. This is the point of origin of the fire and appears as a "V" on the structure. The only "V" on the outside of the building was on the west side between the bay and a little bedroom window. He found low burning in one room only, the bedroom. The fire line was immediately

above the front of the wardrobe closet between the bay window and the little bedroom window. It was Mazzona's opinion that the fire started immediately in the front wardrobe closet of the bedroom. Two feet in front of the wardrobe, Mazzona found a burnt book of matches. He found burnt clothes, ashes and portions of a burnt bedspread. It was Mazzona's opinion that the fire started at that point by someone using a book of matches. This comports with Gail Marek's statement. She stated that she dropped a lit match on a bedspread in the closet area of the bedroom. She stated that her mother then took a whole book of matches, lit it and placed it on the spread.

■■ It is also noteworthy that Marek gave four inconsistent statements concerning the cause of the fire. Motive was established, independent of Marek's confession, by the testimony of Marek's father and her husband. We therefore believe the *corpus delicti* was established independent of any improper reliance on Marek's confession.

The defendant next contends that the trial court improperly admitted the charred matchbook into evidence after the close of the evidence and improperly denied her a continuance to obtain an expert witness to testify that the matches were unidentifiable. She also argues that the trial court abused its discretion because the evidence was admitted after the close of all the evidence and the defendants were not allowed to introduce evidence in rebuttal.

■■ The reopening of a case for new evidence at the completion of all the evidence is within the discretion of the trial court. (*People v. Wilder* (1970), 119 Ill. App. 2d 422, 256 N.E.2d 103; *Lee v. Chastang* (1979), 79 Ill. App. 3d 622, 398 N.E.2d 1250.) In all the cases cited by the defendant the prosecution was allowed to reopen the case after the close of all the evidence. In every case no abuse of discretion was found.

Also, Mazzona testified at length concerning the book of matches during the State's case in chief. The defense had every opportunity to cross-examine Mazzona on this matter and to offer expert evidence in rebuttal. We conclude that the trial court did not abuse its discretion.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

JOHNSON and ROMITI, JJ., concur.