THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
BRIAN SCHACHT, Defendant-Appellant.

Third District   No. 3—91—0709

Opinion filed August 21, 1992.

James Hatcher, of Hatcher & Rose, of Peoria, for appellant.

Edward Burmila, Jr., State's Attorney, of Joliet, and Howard R. Wertz, of Lynwood (John X. Breslin, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McCUSKEY delivered the opinion of the court:

Brian Schacht was convicted by a jury of unlawful possession of a controlled substance with intent to deliver (Ill. Rev. Stat. 1989, ch. 56½, pars. 1401(a)(2), 1401.2(1)). Schacht was sentenced to 10 years' imprisonment.

Schacht appeals, alleging that the trial court erred: (1) in denying his motion to quash arrest and suppress evidence; (2) by improperly restricting his cross-examination of a codefendant; and (3) in denying his request to reopen his case to call another witness.

We find: (1) that the police had sufficient probable cause to stop Schacht's automobile and arrest him; (2) that the trial court did not err when it limited Schacht's inquiry into how long a codefendant might be imprisoned as a result of a plea agreement; and (3) that the trial court properly denied Schacht's request to reopen his case. Accordingly, we affirm.

The following evidence was presented at Schacht's suppression hearing.

During the period from May 8 through May 18, 1990, a confidential paid informant gave Will County Sheriff's Lt. Paul Kaupas detailed information concerning three individuals who were involved in distributing narcotics. Lt. Kaupas had used this confidential source on 10 prior occasions and found that his information was always reliable and accurate. Lt. Kaupas was also aware that the informant had given other police agencies information which had been corroborated and led to convictions.

During his first conversation with the confidential source, Lt. Kaupas was told that a woman named Gail Buczyna and two men nicknamed "God" and "Animal" were distributing drugs in the Mokena area. Lt. Kaupas was a veteran deputy sheriff with 16 years'

experience. He was now operating in the sheriff's Violent Crime and Drug Suppression Unit. In addition to the male suspects' nicknames, the informant gave Lt. Kaupas a general description of the two men, including their height, weight, hair color, race, and complexion problems. The informant also said that he would telephone Lt. Kaupas as soon as he had more specific information.

Lt. Kaupas's second conversation with the informant occurred on May 11, 1990. The informant said that Gail Buczyna lived in an apartment in Mokena in the general area of Schoolhouse Road and 191st. The informant also described the vehicle Buczyna drove. However, he indicated that her car was not being used for drug deliveries. The informant told Kaupas that the first names of the two men were Brian and Jewel. Also, he described a 1977 black Cutlass which was being used by the two men to distribute drugs. The informant gave Kaupas the license number of the Cutlass and information concerning their recent arrest in Crestwood.

Armed with this initial information, Lt. Kaupas began on May 11 to run the data through police computers. He also called the Crestwood police department to corroborate the recent arrest of the two men. On May 15, Lt. Kaupas obtained from the police computers and the Crestwood police the following information: the full names of Brian and Jewel, their dates of birth, additional information regarding their recent arrests, recent photographs of the two men, and their entire criminal histories.

Lt. Kaupas then called the informant on May 15 and indicated that he had corroborated the initial information. The informant told Kaupas that Schacht and Mitchell would be driving the black Cutlass in Mokena that evening. He said the car could be found either in the area of Schoolhouse Road and 191st or 116th Avenue and 195th. Lt. Kaupas began surveillance that evening. However, he did not see anything. After concluding the surveillance, Kaupas called the informant. The informant told Kaupas that he had just missed observing the two men driving the Cutlass.

The informant gave Lt. Kaupas another time, place, and date where Schacht and Mitchell could be found. This information was corroborated by Kaupas when he observed the 1977 Cutlass and the two men at the time and place indicated by the informant.

Prior to May 18, the informant gave Lt. Kaupas the exact apartment location for Gail Buczyna. He said her apartment was located at 10738 Greenwood in Mokena.

Early on May 18, 1990, the informant called Lt. Kaupas to tell him that Schacht and Mitchell would be distributing drugs that eve-

ning. The informant called later to say that Schacht and Mitchell would be leaving 116th Avenue and 195th at around 9 p.m. to go to Gail Buczyna's apartment. The informant called again around 8 p.m. to confirm that Schacht and Mitchell would be arriving at Buczyna's apartment sometime between 9 p.m. and 10 p.m. to cut cocaine and bag it for distribution.

Based upon all of this information, Lt. Kaupas gathered a contingent of police to begin surveillance of Buczyna's apartment. At approximately 9 p.m. on May 18, the informant made his final call. The informant now told Kaupas that Schacht, Mitchell, and Buczyna would possibly be joined by another woman. Lt. Kaupas then assigned each police officer specific surveillance duties. Kaupas told the officers that they would be making an investigatory stop of the Cutlass shortly after the suspects left Buczyna's apartment. Lt. Kaupas informed the officers that they should draw their guns during the investigatory stop because Schacht and Mitchell had been convicted of weapons charges. Also, Lt. Kaupas told the officers that Mitchell had a history of violent crimes.

The surveillance of Buczyna's apartment began around 9 p.m. The police used binoculars to watch the apartment and the Cutlass. At approximately 10:30 p.m., the officers saw Schacht, Mitchell, Buczyna, and an unknown woman leave Buczyna's apartment and enter the Cutlass. Schacht sat in the driver's seat. Mitchell sat on the front passenger side. Both women sat in the back seat.

The police watched as Schacht began to drive the Cutlass away from the apartment. Schacht drove several hundred feet before the police moved in to stop the vehicle. Approximately five to seven marked and unmarked police vehicles, with their red lights flashing, drove in front of and behind Schacht's vehicle. Lt. Kaupas had previously assigned himself to watch Mitchell's passenger door. As Lt. Kaupas approached, he told Mitchell to stay in the car. Mitchell reacted by jumping out of the vehicle and running past Kaupas before he was apprehended. Schacht refused to stop the vehicle. Schacht put the vehicle in reverse and started to back up the car. Deputy Pete Piazza stopped Schacht's car when he reached into the Cutlass and turned off the ignition.

Lt. Kaupas watched Mitchell when he exited the vehicle. He saw him drop on the ground a clear plastic bag containing snow seals. As Schacht was taken out of the car, Deputy Piazza saw in plain view a clear plastic ziploc bag located on the driver's floor. Inside the ziploc bag were many small bags containing a white powdery substance. The

lab tests later confirmed that the white powdery substance was cocaine.

The officers who stopped Schacht's vehicle were wearing either Mokena police uniforms or hats and vests clearly marked with the word "police." The marked cars were Mokena police vehicles.

Schacht admitted at the suppression hearing that he saw a car in front of him with a red flashing light. Schacht admitted not stopping and also admitted putting his car in reverse. He said, "And I thought I was in his way, so I kept trying to get out of his way." Schacht finally admitted that the individuals who approached his vehicle said they were police, had their weapons drawn, and told everyone to freeze.

At the conclusion of the suppression hearing, the trial court denied Schacht's motion. A reviewing court will not disturb a trial court's ruling on a motion to suppress evidence unless that finding is manifestly erroneous. (*People v. Tisler* (1984), 103 Ill. 2d 226, 469 N.E.2d 147.) Each case must be decided and reviewed on its own individual facts. *People v. Herron* (1980), 89 Ill. App. 3d 1048, 412 N.E.2d 1365.

The law is clear that a police officer is authorized to approach an individual to investigate possible criminal behavior even when there is no probable cause to make an arrest. (*Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868.) This is commonly referred to as a *Terry* stop. The mere fact that a police officer's gun is drawn does *not* convert an investigatory stop into an arrest. *People v. Jackson* (1986), 145 Ill. App. 3d 789, 495 N.E.2d 1359; *People v. Washington* (1990), 205 Ill. App. 3d 452, 563 N.E.2d 517.

In order to justify stopping an individual, a police officer must be able to point to specific, articulable facts which, when taken together with the rational inferences from those facts, reasonably warrant the intrusion. (*Terry*, 392 U.S. at 21, 20 L. Ed. 2d at 906, 88 S. Ct. at 1880.) *Terry* contemplates a brief intrusion, as minimal as possible, to verify information or to ascertain whether criminal activities have in fact taken place.

■ We find that Lt. Kaupas had specific articulable facts from which he could reasonably initiate the investigatory stop of Schacht's vehicle. Lt. Kaupas acted pursuant to accurate information he received from a reliable paid informant. Kaupas also acted upon verified information he received from police computers and the Crestwood police department. Finally, Lt. Kaupas was able to corroborate all of the informant's information through actual surveillance. Schacht's and Mitchell's criminal histories indicated a clear probability that they

would be armed. The police officers reasonably drew their weapons for their own individual safety when they stopped Schacht's vehicle. Based upon all of the relevant facts, we find that the brief investigatory stop of Schacht's vehicle was warranted.

The contraband seized following the investigatory stop was found in plain view and gave the police probable cause to arrest Schacht and Mitchell. Therefore, we find the trial court was correct in denying Schacht's motion to suppress evidence and quash arrest.

Next, Schacht contends that the trial court committed reversible error by restricting his cross-examination of Gail Buczyna. Buczyna was a codefendant whose criminal trial had previously been severed from Schacht's jury trial. She testified as a prosecution witness against Schacht. During the opening statements in Schacht's trial, the prosecutor remarked as follows:

> "Ladies and gentlemen of the jury, after the officers testify, I am going to produce a witness for you. And I am going to tell you a little bit about that witness. Her name is Gail Buczyna. She was in fact in the back seat of that vehicle. Miss Buczyna is one of the people who were involved in this case. And she is going to go to prison for her involvement in this case. But in return for a lighter sentence, she is going to testify for you."

During direct examination, Buczyna admitted that she had entered into a plea agreement with the prosecutor. Buczyna testified that in exchange for her testimony against Schacht and her plea of guilty, she would receive a lenient sentence recommendation from the prosecution. The prosecutor confirmed the plea bargain with Buczyna by saying "we have some kind of arrangement made out regarding your testimony *** in return for testifying here today, you are going to plead guilty, and the People are going to recommend that you serve two years in the Illinois Department of Corrections."

During cross-examination, the trial court refused to allow Schacht to inquire concerning the length of time Buczyna expected to serve in prison. Schacht wanted to show the jury that Buczyna would serve little, if any, actual time in prison due to early release provisions, good time, and the problems of overcrowding in the Department of Corrections. The court ruled that this inquiry was irrelevant. We agree.

■ Also, the trial court prohibited Schacht's counsel from asking Buczyna about the specific felony classification for her crime. The trial court held that it was irrelevant whether it was a Class 1 or Class 2 felony. We agree. We note that the trial court did allow Schacht to cross-examine Buczyna regarding the fact that she was re-

ceiving a favorable recommendation from the prosecutor in exchange for her guilty plea and testimony against Schacht.

Generally, a defendant's right to cross-examine and confront a witness concerning her bias, interest, motive, and prejudice should not be unduly restricted. (*People v. Atteberry* (1991), 213 Ill. App. 3d 851, 572 N.E.2d 434.) We certainly agree that Buczyna's testimony could have been biased because of her desire to please the prosecutor. However, we also find that the trial court did allow Schacht proper cross-examination into her possible bias, interest, motive, and prejudice. Therefore, we hold that the trial court did not improperly limit Buczyna's cross-examination.

Schacht next alleges he was denied a fair trial when the prosecutor during closing argument personally vouched for Buczyna's credibility as a witness. During summation, the prosecutor stated:

"There were no lies pointed out, no motivation to lie, *** she told you the truth. *** *I believe she told you the truth.* *** Ladies and gentlemen: they (defense) want you to think that she has gotten off scot free. She hasn't. The girl is going to prison, because she was involved." (Emphasis added.)

We note that Schacht failed to raise this issue by making a timely objection at trial. Also, Schacht failed to include this claim of error in his post-trial motion. Therefore, we find that this issue has been waived for purposes of appeal. *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.

Finally, Schacht argues that the trial court erred by not allowing him to reopen his case after the trial court found Shannon McDuffie, a codefendant, not guilty. Shannon McDuffie had waived her right to a jury trial. She was being tried simultaneously in a bench trial during Schacht's jury trial. The trial court heard McDuffie's final argument after Schacht rested his case. The trial court then found McDuffie not guilty before the jury heard closing arguments in Schacht's trial. After McDuffie was found not guilty, Schacht sought to reopen his case and call McDuffie as a witness.

Generally, the defendant bears the burden of showing a sufficient reason for his request to reopen the evidence. (*People v. Moore* (1989), 189 Ill. App. 3d 957, 546 N.E.2d 232.) The decision to reopen a case and allow new evidence is within the sound discretion of the trial court. (*People v. Marek* (1980), 92 Ill. App. 3d 746, 415 N.E.2d 1230.) The trial court ruled that Schacht was attempting to call McDuffie as a defense witness solely to take advantage of the fact she had been acquitted. We agree. To allow this trial tactic would quite possibly encourage perjury. We note that prior to resting his case,

Schacht never requested calling McDuffie as a witness. Therefore, we find that the trial court did not abuse its discretion when it denied Schacht's request to reopen his case.

For the reasons indicated, the judgment of the circuit court of Will County is affirmed.

Affirmed.

SLATER and STOUDER, JJ., concur.